Kelly *v.* Ochiltree Electric Company (et al., Appellant).

Argued October 30, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*James J. Burns,* for appellant.

*M. E. Rowley* of *Craig & Rowley,* for appellee.

OPINION BY STADTFELD, J., January 29, 1937:

In this workmen's compensation case, a claim petition for compensation was filed by dependents of a deceased employee. The order of the referee awarding compensation was affirmed by the Workmen's Compensation Board and also by the Court of Common Pleas of Beaver County, in an opinion by READER, P. J. The insurance carrier has appealed from the action of the court below.

We quote from the opinion of the Workmen's Compensation Board: "The Referee awarded compensation in this case, having found that claimant's decedent, Cameron W. Kelly, was injured in an automobile which collided with a truck, while he was returning from a trip to a convention at Miami, Florida, sponsored by the Ochiltree Electric Company, and that this accident resulted in injuries to the decedent which was the cause of his death about two hours later. The Referee further found that the decedent was in the employ of the Ochiltree Electric Company on January 24, 1935, as a retail salesman at an average weekly wage of $31.80.

"From these facts the Referee concluded that the decedent sustained his fatal injuries while in the course of his employment with the defendant company; and that his dependents were entitled to recover compensation on account of his death, as provided in the Workmen's Compensation Act of Pennsylvania. ...... It appears that the sole controversy in this case hinges on the question as to whether or not the decedent was in the course of his employment at the time of his fatal

accident, and we are of the opinion that the Referee's findings of fact are warranted by the evidence. However, we are of the opinion that the evidence warrants a finding of fact that from the time decedent started from Pittsburgh, Pa. to attend the convention of the defendant company at Miami, that he was at all times subject to the control and direction of the defendant. The evidence shows that from the time he was summoned to attend the dinner at Pittsburgh, the evening before the caravan of automobiles started for Florida, he was charged with a great many duties for the benefit of his employer. The employer paid all the expenses, mapped out the itinerary, expected him to stop at certain hotels, attend the meetings, and mingle with the other salesmen, and all this was for the purpose of building up and improving the sales organization of the defendant company."

There is but little, if any, dispute in the evidence as to the facts involved. They are correctly set forth in the opinion of the lower court from which we quote in part, as follows: "Cameron V. Kelly, from some time in the year 1933 to the date of his death on January 24, 1935, was in the employ of the defendant, Ochiltree Electric Company. This company, the employer, had the general agency in Western Pennsylvania for the sale of household appliances manufactured by the General Electric Company. Mr. Kelly was a retail salesman in the employ of said Ochiltree Electric Company, his territory being in the city of Pittsburgh and adjacent sections of Allegheny County, Pennsylvania. He lived in Pittsburgh. In order to promote the sale of its products the General Electric Company organized what was known as the "Toppers Club". Membership in this club is limited to those retail salesmen in the employ of each distributor, such as Ochiltree Electric Company, having a certain volume of sales. Membership is for a period of one year, and is based upon

the sales record of the preceding year. The purpose of the club is to promote cooperation among the various salesmen, loyalty to the employer, to reward successful work, to furnish each member with knowledge of the product or products he is selling, and to advise him as to the most effective methods in making sales. The Toppers Club holds a convention during each winter. Members from each agency are sent to the convention at the joint expense of the General Electric Company and of the distributor, in this case Ochiltree Electric Company.

"In January, 1935, Cameron V. Kelly received notice from the Ochiltree Electric Company to the effect that his sales for the year 1934 had won him a membership in the Toppers Club for 1935, and that the annual convention was to be held at Miami, Fla., later in that month. Mr. Kelly was notified of the time and place of meeting of those who would attend the convention from Pittsburgh for the purpose of making their start for Miami, and was instructed to be present at this place at the time fixed. All arrangements for the trip for those employes of Ochiltree Electric Company who were entitled to attend were made by that Company. ......Upon the automobile conveying Mr. Kelly and the other salesmen to Miami were signs furnished by Ochiltree Electric Company bearing the words 'General Electric Toppers Club; Ochiltree Electric Company.'"

The lower court dismissed the appeal and entered judgment on the award.

The contention of the appellant is that before there can be any recovery that there must be evidence to show that the deceased had been *actually engaged in the performance of services for the defendant company at the time of the accident.*

The assignment of error based on the occurrence of the accident outside of the State of Pennsylvania, and

thereby depriving the Workmen's Compensation Board of jurisdiction, has not been pressed and has apparently been abandoned except as to an attempted distinction between the terms "in the course of employment" and "performing services for employers", as hereinafter referred to.

We are not a fact finding body and our sole inquiry must be directed to an examination of the record to ascertain whether there is legally competent evidence to sustain the findings of the Board on which the judgment of the lower court was entered.

Mr. Ochiltree, President of defendant company testified in relation to the purpose of the Toppers Club: "A. It was a reward that was given for sales accomplishments with the idea of stimulating sales, the purpose was to give a reward for a certain sales accomplishment with a purpose possibly to stimulate sales; to encourage other salesmen to increase their efforts and participate in this same sort of a reward. Q. And speed up and build the sales? A. Yes, that would enter into it. ...... A. It was an additional reward of what a man had already received for sales made in 1934, and we naturally hoped that it would benefit, that it would be benefited by our entire sales organization, to have people participate in this trip."

That the salesmen who won this trip were expected to make it is evident from the testimony of the same witness: "Q. Mr. Ochiltree, you expected your salesmen who won this trip, to make it, didn't you? A. We naturally expected it, sure."

Mr. R. W. Evans, sales promotion manager of defendant company, prepared a schedule of the trip to Miami, showing the route to be taken, the mileage and the hotels at which the party would stop.

That the determination to travel by automobile was decided upon by the company is also shown by the testimony of Mr. Evans as follows: "Q. How was

it and by whom was it decided that the trip would be made by automobile rather than by train? A. We all got together. Q. Who are, 'we all'? A. We talked about it among ourselves. Q. Who do you mean 'we,' that you are talking about? A. Well, I would say Mr. Ochiltree, Mr. Houserman, Mr. Stalford, and we talked to the sales directors and we also talked in open meetings to the salesmen and told them what we were going to do." He also testified as to the character of the meetings at Miami as follows: "Q. Well, what was the keynote of the meetings? A. Was congratulating these men on the wonderful work they had been doing and giving them sales pointers for the coming year. Q. In other words, it was pretty much of a sales talk? A. Well, yes ...... Q. And on the second and third night, you say there were several speakers? A. That's correct. Q. And they congratulated the toppers and even discussed the sales plans and program for the coming year? A. In a general way, yes."

In a bulletin issued by the sponsors of the Toppers Club, giving plans for the following year, the following appears: "In addition, there will be an unusual educational feature for those who care to participate. The major kitchen appliances will be displayed and the process of manufacture and assembly will be demonstrated by experts direct from the factory."

Quoting from the opinion of the lower court: "The nature and purpose of the Toppers Club, and of its convention as above stated, are such as to justify the inference that the failure of an employe of Ochiltree Electric Company who was a member of the Toppers Club to attend the convention, would create an unfavorable impression with the employer, and would prejudice the position of the employe. Under all the evidence there is no question that the employer expected to realize a distinct benefit, in the way of improved business in the future, from the proceedings of

the convention, and from the attendance of its employes at the convention. It also appears that as a part of the reward of Kelly for his successful work during the year 1934 he was paid a bonus of $25.00 per month as part of his compensation during the year 1935. He received his compensation covering the time spent by him on the trip to Miami."

Appellant endeavors to make a distinction between the terms "in the course of employment" and "performing services for employers," as applied to work done outside of the State.

The Amendment to the Workmen's Compensation Act by the Act of April 29, 1929, P. L. 853, Section One (77 PS Par. 1, p. 353), provides as follows: "...... shall not apply to any accident occurring outside of the Commonwealth, except to accidents occurring ......to Pennsylvania employees whose duties require them to go temporarily beyond the territorial limits of the Commonwealth, not over ninety days, when such employees are performing services for employers whose place of business is within the Commonwealth." We see no reason for this distinction and it is not to be presumed that the legislature would create one test for accidents arising outside of the state and another test for accidents arising within the state, so long as within the course of employment. It will scarcely be contended that a salesman attending a convention sponsored by his employer for the purpose of increasing the efficiency of salesmen, with the ultimate purpose and expectation of increasing the sales of his employer, is not performing service "for his employer", and "actually engaged in the furtherance of the business or affairs of the employer." Any other construction would defeat the purpose of the amendment which was to put men temporarily performing service outside of the state on a parity with those working within the state, limited only by the extent of time during which

such services might be performed. We are not without authority on this point.

In *Messer v. Manufacturers L. & H. Co.*, 263 Pa. 5, 106 A. 85, the question before the court was whether the deceased was "actually engaged in the business or affairs" of his employer within the meaning of Section 301 of Article III of the Act of June 2, 1915, P. L. 738, at the time of the occurrence of the accident resulting in his death. In that case, the Supreme Court stated the facts as follows: "Hiram Messer, the husband of Frances Messer, the appellant, was an engineer in the employ of the Manufacturers Light & Heat Company at the pumping station at Waynesburg. He had been so employed for about three years prior to his death. On the 11th day of July he began his regular vacation of ten days during which time he was subject to be called for service if needed and was paid his usual salary. On the 12th of July William Nester, the superintendent of the company, called him by telephone and requested him to go to the Brave Pump Station, a place about eighteen miles distant from Waynesburg, to inspect this station. The purpose of this instruction by Mr. Nester was to increase the efficiency of Messer as an employee of the company and to educate him as to the best method of conducting a pumping station.

"Complying with this request Messer left his home in Waynesburg in his own automobile accompanied by one Loughman, an assistant engineer of the defendant company. While on the road Messer ran his automobile into a bridge over a creek where there is a sharp turn in the road, throwing Loughman against the windshield and injuring him so that he became unconscious. After this accident Messer continued on the road for a short distance in the direction of the Brave Pump Station, and while attempting to turn his machine in some way lost control and the machine went

over an embankment. It turned over falling upon him and crushing him so as to cause his death about five o'clock the same day."

The Supreme Court in deciding that Hiram Messer was actually engaged in the furtherance of his employer's business at the time of his death used the following language on page 9: "He was therefore practically under orders and in the performance of · his duty when he was injured."

In *Chase v. Emery Manufacturing Co.,* 271 Pa. 265, 113 A. 840, the claimant was a salesman employed by an oil concern.. He had a customer, who, while attending the county fair at Clearfield, gave him an order for oil. The customer became separated from his party at the fair and told the agent that if he could not find them he wished to be taken home in the salesman's car. The salesman was to go to his own home and wait for a telephone call. At ten o'clock, while on his way to get the call, and when not more than 100 feet from his own home, he was struck and badly injured by a car. It was held that he had been injured while in the course of his employment. The Supreme Court used this significant language (p. 267): "He was a traveling salesman, whose duties required him not only to be attentive in securing orders for his employer, but, to be a successful salesman, he must be courteous and obliging, frequently performing services not strictly relating to the sale of the commodity entrusted to him, but which aid in its sale because of the accommodation and consideration of the agent."

In *Haddock v. Edgewater Steel Co.,* 263 Pa. 120, 106 A. 196, the claimant had been sent from Pittsburgh to Lowellville, Ohio, to inspect certain machinery for his employer. He made the trip by train and arrived back at Pittsburgh late the same evening. While on the way from the station to his own home, he was struck by an automobile. It was held that he

nad been injured while in the course of his employment. The Supreme Court quoted with approval the words of Chairman Mackey of the board, as follows (pp. 122 and 123) : " 'He was commissioned to go to another city to transact business of importance for his employer. He surely was in the course of his employment at the conclusion of that day's engagement when he was taken to a train near Youngstown for the purpose of returning to Pittsburgh. No one could deny that he was in the course of his employment when on the train for his destination—Pittsburgh.' "

In *Howell v. Kingston Twp. School District,* 106 Pa. Superior Ct., 89, 161 A. 559, this court said, at p. 95 : "We believe that the judgment entered in this case is fully sustained by *Messer v. Mfrs. Light and Heat Co.,* 263 Pa. 5, and *Haddock v. Edgewater Steel Co.,* 263 Pa. 120, wherein it was held that if an injury happens an employee while on vacation, it is compensable, if at the time he was charged with any duties for the benefit of his employer."

To same effect see *Bocock v. State Board of Education* (Supreme Court of Idaho), 37 Pac. (2nd) 232; *Stockley v. School District,* 231 Mich. 523; 204 N. W. 715; *Mann v. Board of Education of City of Detroit,* 266 Mich. 271, 253 N. W. 294; *Smith v. Seamless Rubber Co.,* 111 Conn. 365, 150 Atl. 110; *Dameron v. Yellowstone Trail Garage* (Idaho), 34 Pac. (2nd) 417.

After a careful consideration of the entire record, we are satisfied that the testimony fully sustains the finding of the Board and that there was no error in entering judgment on the award.

The assignments of error are overruled and judgment affirmed.